THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNMARIE GENTILE | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:08-CV-2330** |
| | : | **(JUDGE MARIANI)** |
| DES, PROPERTIES, INC. d/b/a | : | |
| CLASSIC QUALITY HOMES, INC., et al., | : | |
| | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

### I.  Introduction

Before the Court are Defendants' Motion for Summary Judgment (Doc. 61)[1] and

Motion to Strike (Doc. 74).  For the reasons set forth below, the Court will grant in part and

deny in part both motions.

### II.  Statement of Facts and Procedural History

In June 2007, David and Emma Wengerd purchased a home construction company,

Classic Design Homes, Inc. ("CDH"), from Plaintiff's previous employer, Raymond Bender

("Bender"), who continued to have access to part of the office until December 31, 2007.

(Asset Purchase Agreement, Doc. 62, Ex. D).[2]  The Wengerds named their company DES

---

[1] At the outset, the Court notes that Plaintiff has voluntarily agreed to withdraw: her claims against David and Steven Wengerd on both Counts I and II, her claim against Steven on Count III, her claims for vacation and sick/personal time on Count IV, and her claim against Steven on Count V (Doc. 77).

[2] "Possession of Premises and Vehicles shall be delivered to Buyers on the Closing Date, except that the Sellers reserve free of any rent or charge the right to occupy and use two (2) rooms in the sales office for their own purposes until no later than December 31, 2007." (*Id.* at ¶ 5).

Properties, Inc. ("DES"), d/b/a Classic Quality Homes, Inc. ("CQH"). (S. Wengerd Dep., Doc. 62, Ex. B, 15:22-24). Steven is the Wengerds' son who owns a 5% share in the company and functions as the Vice-President (*Id.* at 12:10-12, 15:5-11). At his deposition, Steven testified that he acts under the supervision of his father, and he does not supervise the employees. (*Id.* at 23:19-24:4).

Between the sale and December 31, 2007, Bender continued to access the property, purportedly for business purposes. However, his behavior while on the premises occasioned at least two police reports of sexual harassment and assault against Plaintiff, an employee. Between June and November 2007, David was allegedly aware of Bender's violent tendencies. He himself described Bender as "scary." (DW1 Dep., Doc. 62, Ex. C, 62:23-63:1). Plaintiff stated that she had informed David about Bender's history of making sexual comments and inappropriate touching soon after he bought the company. (Gentile Dep., Doc. 62, Ex. E, 152:4-153:12; 159:1-6, DW1 Dep., Doc. 70, Ex. A, 60:1-24). This included an instance of Bender exposing his buttocks to Plaintiff sometime in October 2007. (Gentile Dep., Doc. 62, Ex. E, 152:22-153:8, Police Statement, Doc. 70, Ex. K, at 3-4).[3]

On November 9, 2007, Bender returned again to DES and allegedly sexually assaulted Andrea Costenbader, Plaintiff's co-worker, by shoving his hand down her pants and grabbing her buttocks. (Police Statement, Doc. 70, Ex. K). After the incident, two male co-workers, (Gaito and Knott) advised Costenbader to call the police. Knott also told

---

[3] In her statement to the police, Plaintiff also alleged that Bender "had shoved his whole face into my breast." (Doc. 70, Ex. K, at 3).

2

Bender to leave the premises, and Bender did not return that day. (Costenbader Dep., Doc. 62, Ex. F, 91:18-94:22). Following Bender's assault on Costenbader, Plaintiff called the police. Both Costenbader and Plaintiff submitted statements to the police on the 10th. (Doc. 70, Ex. K). David was not on the premises at the time of the assault, but he came in later that day and found out what had happened. (DW1 Dep., Doc. 62, Ex. C, 71:12-72:7). He said that Knott "stepped in and we decided we should keep [Bender] off the property." (Id. at 115:19-21). Knott claims that the Wengerds "refused to believe Ms. Costenbader and Ms. Gentile, and sided with Mr. Bender. (Knott Aff., Doc. 70, Ex. L, ¶¶ 19-20).[4] David admitted he did not conduct an independent investigation because he felt the police were better equipped to handle the matter. (DW1 Dep., Doc. 62, Ex. C, 118:5-11).

David acknowledged that Gentile had told him about Bender's conduct and her complaints. (DW2 Dep., Doc. 70, Ex. B, 49:9-51:4). However, after his conversation with Gentile, David admitted he did not approach Bender about it because "Bender was like $50,000,000 and I would have been a little guy. I would never dare say anything to Bender." (DW1 Dep., Doc. 62, Ex. C, 61:4-8). He then said he did not do anything after the conversation with Gentile "because [Gentile] put me under the impression that all you had to do was tell him to leave and he would go. So I didn't think it was anything serious at this point." (Id. at 61:11-14). David admitted that when Gentile told him about Bender's conduct, he understood her to mean that both she and Plaintiff were bothered by it. David

---

[4] Knott was also terminated in August 2009 and at the time of his affidavit was involved in a lawsuit against DES for commissions he claims he never received. Id. at ¶¶ 33-34.

also said that he did not fully believe Gentile because "I guess my idea would have been that, if you want to bother somebody, you would bother some different type of person." To clarify his answer he stated, "I guess somebody a little more attractive." (DW2 Dep., Doc. 70, Ex. B, 51:12-21).

Bender returned to the office on November 13, 2007, asking "Where is she?" ostensibly referring to Costenbader (Costenbader Dep., Doc. 70, Ex. F, 40:6-7). A salesman (Hanyon) distracted Bender and got him out of the office by directing him to the warehouse. (*Id.* at 41:8-14). Bender did not return, and Costenbader had no contact with him that day. (*Id.* at 40:16-18, 41:13-15). David allegedly apologized for "putting his money ahead of us girls." (*Id.* at 46:16-18). Costenbader alleges that David delayed delivering the letter until after he had closed sales on some of Bender's houses. (DW1 Dep., Doc. 70, Ex. A, 116:13-17; 116:24-117:14). Costenbader stayed home for the next two days. (Costenbader Dep., Doc. 70, Ex. F, 59:10-13). On the 15th, David confirmed to Costenbader that he had personally delivered the letter to Bender.[5]

Plaintiff settled her case separately with Raymond Bender and withdrew the criminal charges against him. After Costenbader was terminated, Plaintiff claims she was subjected to an even more hostile work environment: she was harshly disciplined, repeatedly threatened with termination, her work-station was searched for evidence to justify terminating her, and Bender's attorney repeatedly harassed her at work with phone calls.

---

[5] Defendant has not produced this letter as evidence because David's copy was allegedly destroyed in a fire at the office. His attorney who drafted the letter has a brain tumor and has been unable to produce it. (DW1 Dep., Doc. 70, Ex. A, 116:19-23).

(Doc. 62, Ex. I, at ¶ 8; Gentile Dep., Doc. 62, Ex. E, 79:13-82:7). Furthermore, Plaintiff claims that after Costenbader was fired, other male co-workers made jokes about Bender to Plaintiff. On one occasion, a male co-worker "pulled a piece of lint off my shirt, and the guys made a joke saying, You better watch out or you're next, or made a joke towards what was going on with Bender. And David was sitting right there and they laughed and I was furious that he allowed them to say that." (Gentile Dep., Doc. 62, Ex. E, 150:15-24). Plaintiff also filed a written complaint with David about the offensive comments. (Gentile Dep., Doc. 70, Ex. G, 146:10-20).

Because Defendants allegedly failed to take action, Plaintiff filed an EEOC Charge of Discrimination. (Doc. 62, Ex. I). Her Charge contained three Counts: (I) Sex Discrimination/Harassment/Pregnancy Discrimination, (II) Race Discrimination/Harassment, and (III) Retaliation. She also claimed that she experienced discrimination on a continuing basis. According to the EEOC Case Referral Log, Gentile filed her Charge on November 30, 2007. (Doc. 62, Ex. J). Her initial charge was received by the agency that day, but the investigator did not receive it until November 25, 2008. (*Id.*). Meanwhile, Gentile had requested a right-to-sue letter on August 28, 2008 (*Id.*) because more than 180 days had passed since she had filed her initial charge. The letter was issued on December 11, 2008 (Doc. 70, Ex. R), and she filed her Complaint in this case on December 31, 2008. (Doc. 1).

Also in November 2007, Plaintiff notified David she was pregnant, with an anticipated due date of August 2008. (Gentile Dep., Doc. 62, Ex. E, 78:5-24). According to Plaintiff,

David agreed to provide her with paid maternity leave and paid vacation time. (*Id.* at 86:7-17, DW2 Dep., Doc. 70, Ex. B, 92:9-94:18, SW Dep., Doc. 70, Ex. C, 45-49). However, David later approached Plaintiff about taking a temporary layoff on June 28, 2008 with a return to work on October 1, 2008, and proposed she receive unemployment compensation during that time. (Gentile Dep., Doc. 62, Ex. E, 89:2-90:7, 94:2-9). During that three-month period, Plaintiff alleges Defendants continued to call her in to work without fully compensating her. (*Id.* at 19:24-20:2, 96:9-12).

Furthermore, Defendants told unemployment compensation authorities that she had quit her job (Doc. 70, Ex. Z), so she was required to pay back all of the unemployment compensation she had received. (Doc. 62, Ex. Q).

### III.    Standard of Review on Motions for Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine

issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## IV. Analysis

### Motion to Strike

Defendants assert that portions of Plaintiff's Answer to Statement of Facts ("ASOF") (Doc. 70) are inflammatory, irrelevant, and merely opinions or conclusions of law instead of brief, helpful, factual statements.

Specifically, Defendants seek to strike ¶¶ 15, 16, 19, 21, 25, 27, 29, 31, 32, 33, 34, 37, 40, 44, 49, 50, 51, 52, 54, 55, 56, 60, 64, 66 and cite *Hartshorn v. Throop Borough*, No. 3:07-cv-01333, 2009 WL 761270, at *3 (M.D. Pa. 2009); *Deluca v. Simmons Mfg. Corp., Inc.*, No. 3:07-cv-2143, 2009 WL 1107909 (M.D. Pa. 2009). In both cases, Judge Caputo struck portions of the Statement of Facts because they were irrelevant, inflammatory, or conclusions of law. Plaintiff has agreed to strike portions of ¶¶ 15, 21, 25, and 33 (Doc. 74, Ex. B), so the Court will grant Defendants' motion and strike those paragraphs accordingly.

As for the remaining paragraphs that Defendants seek to strike, after a review of the ASOF, the Court notes that Defendants object to the listed paragraphs because they contain much material that would be better suited for a brief. The "counterstatements of fact" are essentially arguments. Rather than examining the remaining twenty paragraphs and excising the offending portions (an exhaustive effort that will yield little benefit to either Defendants or the Court), the Court will deny the motion to strike and instead assign any conclusions of law or inappropriate arguments no evidentiary value.

### a. Count I: Sexual discrimination/hostile work environment[6]

Defendants allege that Gentile failed to exhaust her administrative remedies because she did not amend her EEOC charge after November 2007. However, the Court finds there is a sufficient nexus between her sexual harassment/discrimination/hostile work environment claims in her EEOC charge from November 2007 and the same claims in her Third Amended Complaint, especially in light of Plaintiff's claims of Defendants' continuing actions of discrimination. *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 94 (3d Cir. 1999). The Court thus turns to the merits of the parties' arguments.

Plaintiff is alleging that Defendants took inadequate remedial measures in response to Bender's conduct (i.e. they failed to prevent a hostile work environment). To state a claim

---

[6] Under Count I, if the Court finds that Defendants intentionally engaged in an unlawful employment practice, Plaintiff is eligible for backpay, reinstatement, and other forms of equitable relief, such as the clearing of any negative personnel files or references. 42 U.S.C. § 2000e-5(g)(1). As such, Plaintiff is entitled to seek such relief in connection with her claim that DES is directly liable for its alleged failure to take prompt remedial action in response to her complaints about Bender's activity and for perpetuating a hostile work environment after DES terminated Costenbader's employment.

under Title VII for discrimination resulting from a hostile work environment, an employee

must show that:

> (1) she suffered intentional discrimination because of her [sex]; (2) the
> discrimination was severe or pervasive; (3) the discrimination detrimentally
> affected her; (4) it would have detrimentally affected a reasonable person in
> like circumstances; and (5) a basis for employer liability is present.[7]

*Guthrie v. Baker*, 583 F. Supp. 2d 668, 681 (W.D. Pa. 2008) (citing *Jensen v. Potter*, 435

F.3d 444, 453 (3d Cir.2006), *overruled in part on other grounds by Burlington N. & Santa Fe*

*Ry. v. White,* 548 U.S. 53, 67–68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

An employer is liable under Title VII for harassment of its employees by non-

employees such as Bender where it is aware of the problem and fails to take prompt and

appropriate corrective action. *Faragher v. City of Boca Raton*, 524 U.S. 775, 789, 118 S.Ct.

2275, 2284 (1998) ("the combined knowledge and inaction may be seen as demonstrable

negligence, or as the employer's adoption of the offending conduct and its results, quite as if

they had been authorized affirmatively by the employer"). EEOC Guidelines also provide

that:

> An employer may also be responsible for the acts of non-employees, with
> respect to sexual harassment of employees in the workplace, where the
> employer (or its agents or supervisory employees) knows or should have
> known of the conduct and fails to take immediate and appropriate corrective
> action.

29 C.F.R. § 1604.11(d-e).

---

[7] The fifth element is usually "the existence of *respondeat superior* liability." *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007). However, in this case, Bender was not an agent of DES because he was no longer an owner or employee. Plaintiff has specifically stated she is suing DES for direct, not vicarious, liability.

An employer can be liable for the harassing conduct of the victim's harasser if the employer was "negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." *See Andreoli*, 482 F.3d at 644 (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir.1997) and *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 106 (3d Cir.1994)). Even if the remedial action does not stop the alleged harassment, it is "adequate" if it is "reasonably calculated" to end the harassment. *Knabe v. Boury Corp.*, 114 F.3d 407, 412-13 (3d Cir.1997). The employer also has a duty to investigate whenever it becomes aware of harassment. It is not essential for the victim of harassment to lodge a formal or informal complaint. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408 (1986) ("Finally, we reject petitioner's view that the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate petitioner from liability.").

Bender's contract with Defendants allowed him access to two rooms in the sales office until the end of 2007. (Asset Purchase Agreement, Doc. 62, Ex. D,). Under Pennsylvania law, the contract is to be interpreted in light of an implied duty of good faith and fair dealing, as well as the doctrine of necessary implication. That doctrine, similar to the requirement of good faith, has been described as follows:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract . . . to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Slater v. Pearle Vision Ctr.*, 546 A.2d 676, 679 (Pa. 1988); *see also Slagan v. John Whitman & Assocs.*, No. Civ.A. 97-3961, 1997 WL 587354, at *5 (E.D. Pa. Sept. 10, 1997) (holding in a sexual harassment case that "Whether under the Restatement's implied duty of good faith performance of a contract or the doctrine of necessary implication, . . . Plaintiff's employment contract contained the implied term that his conduct would be lawful."). Though Bender was not an employee of Defendant, his contract with Defendant contained an implied term that while on the business premises, his conduct would be lawful.  Once Bender allegedly breached that duty by sexually harassing Costenbader and Plaintiff, at the very least, Defendants had a duty to investigate and prevent further harassment to its employees. *Faragher*, 524 U.S. at 789; *Meritor*, 477 U.S. at 72; *Andreoli*, 482 F.3d at 644; *Knabe*; 114 F.3d at 412-13.  Because Defendants cannot establish as a matter of law that they were either unaware of Bender's conduct or that they took prompt and adequate remedial measures, the Court will deny their motion for summary judgment on this count.

Following the events of November 9, 2007, Gentile filed formal criminal charges against Bender. (Doc. 70, Ex. K).  Once David came to the office, he learned of the day's events. (DW1 Dep., Doc. 70, Ex. A, 71:12-72:7).  Defendants cannot claim lack of notice. Because Defendants were as on notice, they had a duty to investigate the problem. However, David admitted he did not because he allegedly felt the police were better equipped to handle it.  (*Id.* at 118:5-11).  He also stated he personally delivered a letter to Bender warning him to stay off the property, but Defendants have not produced the letter

yet. (*Id*. at 116:19-23).  David also waited until closing on some of Bender's homes before delivering the letter (*Id*. at 116:13-17; 116:24-117:14).  He also stated at his deposition that he would never dare to say anything against Bender because he, David, was a "little guy" and Bender was $50,000,000.00 (*Id*. at 61:4-8), which is inconsistent with his statement that he personally delivered the letter to Bender and told him to stay away.

Though Bender and Costenbader had no contact when Bender returned to the office on November 13, he was kept away from Costenbader not through the employer's action but because one of the salesman intervened to distract Bender.  The employer itself took no action to ensure Costenbader was insulated from Bender presence.  (Costenbader Dep., Doc. 70, Ex. F, 40:16-18, 41:13-15).

Plaintiff claims that after Costenbader was fired, other male co-workers made jokes about Bender to Plaintiff.  On one occasion, a male co-worker "pulled a piece of lint off my shirt, and the guys made a joke saying, You better watch out or you're next, or made a joke towards what was going on with Bender.  And David was sitting right there and they laughed and I was furious that he allowed them to say that." (Doc. 62, Ex. E, at 150:15-24).

Therefore, the Court will deny the motion for summary judgment on the count for sexual harassment/discrimination/hostile work environment based on the existence of genuine issues of material fact as to Plaintiff's claims of gender and hostile work environment for failure to take prompt remedial action.

In contrast, DES is entitled to summary judgment on Plaintiff's pregnancy discrimination claim because at her deposition, she said she did not feel she was treated differently from non-pregnant employees (Gentile Dep., Doc. 62, Ex. E, at 79:5-12), even though she claimed in her Third Amended Complaint that Defendants "failed to accord Ms. Gentile, during her pregnancy, the same treatment, terms, conditions and benefits of employment afforded to other employees who were not pregnant." (Doc. 56, ¶ 54). At her deposition, when Defendants' counsel asked her how she was treated differently, she could not "think of anything at the moment." (Doc. 62, Ex. E, at 205:4-16). Plaintiff did not respond to Defendants' motion for summary judgment on this claim in her Brief in Opposition (Doc. 71).[8]  Furthermore, Plaintiff cites to no evidence in the record that she was mistreated because of her pregnancy.

Because Plaintiff did not respond to Defendants' arguments in her Brief in Opposition, she twice stated at her deposition that she was not treated differently as a result of her pregnancy, and there is no independent evidence in the record to support a pregnancy discrimination claim, the Court will grant Defendants summary judgment on Count I based on pregnancy discrimination.

### b. Retaliation

---

[8] Plaintiff's Answer to Defendants' Statement of Facts ("ASOF") ¶ 40 partially addresses Defendants' argument. Defense counsel asked her "aside [from] issues *at the end of your employment*," how she was treated differently based on her pregnancy. (Gentile Dep., Doc. 62, Ex. E, at 79). However, when counsel against asked the question, this time without time limitations, her answer remained the same: she could think of no instance in which she was treated differently because of her pregnancy. (*Id*. at 205).

Under a Title VII retaliation claim, the employee bears the initial burden of establishing a *prima facie* case of retaliation. She must show (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007). Once a plaintiff meets her burden, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)).

Plaintiff claims she engaged in the following protected activity: (1) she complained about Bender's conduct towards her and Costenbader as early as July 2007; (2) in November 2007 when Bender sexually assaulted Costenbader, Gentile called the police on November 9, 2007. They both filed written reports on November 10th; (3) sometime in November 2007, Gentile hand-delivered a letter to David stating she "didn't think that he was protecting my rights. People in the office were making outrageous comments to me that had to do with the assault with Bender, and he never stopped it and witnessed it." (Gentile Dep., Doc. 70, Ex. G, 146:10-20); (4) Gentile filed her EEOC Charge on November 30, 2007; and (5) Gentile filed an application for unemployment compensation on July 1, 2008 and at some unknown times sought wages for time worked and maternity leave.

The Court finds as a matter of law that the actions alleged in item (5) do not constitute protected activity under a Title VII retaliation claim. At least two courts outside of this circuit have held that filing an application for unemployment compensation is not protected activity under Title VII. *McDonald-Cuba v. Santa Fe Protective Svcs., Inc.*, 644 F.3d 1096, 1102 (10th Cir. 2011) ("[Plaintiff] fails to cite any authority recognizing an application for unemployment benefits, without more, as a form of protected activity under Title VII. [Plaintiff's] retaliation claim therefore fails as a matter of law. She has identified no protected activity that could form the basis for a properly-exhausted retaliation claim."); *Edwards v. Creoks Mental Health Srvcs., Inc.*, 505 F. Supp. 2d 1080, 1093 (N.D. Ok. 2007) ("Here, plaintiff did not engage in protected opposition to discrimination; filing for unemployment compensation in [*sic*] entirely unrelated to Title VII. Because plaintiff did not engage in a 'protected activity' under Title VII, defendant is entitled to summary judgment on plaintiff's retaliation claim."). Defendants do not brief this point at all while Plaintiff cites one inapposite case to support her position. *Petrunich v. Sun Bldg. Sys., Inc.*, No. 3:CV-04-2234, 2006 WL 2788208, at *8 (M.D. Pa. Sep. 26, 2006) ("The opposition to [a plaintiff's] claim for unemployment compensation benefits [may be] an adverse employment action because it [could] discourage a reasonable worker from filing [a] discrimination complaint."). *Petrunich* discusses whether *opposition* to an application for unemployment compensation could constitute an *adverse action*, whereas the issue before the Court is whether *filing* the application constitutes *protected activity*. Furthermore, requesting maternity leave is

15

"neither participation in a Title VII proceeding nor an act in opposition of discrimination."
*McCormick v. Allegheny Valley Sch.*, No. 06-3332, 2008 WL 355617, at *17 (E.D. Pa. Feb.
6, 2008). The same reasoning would apply to an attempt to recoup wages earned.
Nevertheless, Gentile can still seek relief under her wrongful discharge claim for the
allegations in (5).

Plaintiff alleges that following her EEOC complaint, internal complaints, and police
report, she was subjected to harsher discipline (i.e., adverse actions) in the form of: (1) an
increased workload as soon as Costenbader was terminated (Gentile Dep., Doc. 62, Ex. E,
125:2-9); (2) threats of termination (on two occasions in January/February and May 2008,
David told Plaintiff, "you know your job depends on it" (*Id.* at 76:7-17; 81:1-82:7; DW2 Tr.,
Doc. 70, Ex. B, 47:2-9); (3) a search of her work-station on November 26, 2007 for evidence
to justify her termination; (4) exposure to harassing phone calls from Bender's attorney
following Bender's arrest; (5) and termination in 2008.

The Court finds as a matter of law, items (1) and (3) do not constitute adverse
actions. After Plaintiff complained about her increased workload, Defendants permitted her
to share it with co-workers. (Doc. 62, Ex. E, 82:20-84:15). Furthermore, her work-station
was searched on only one occasion. (Gentile Dep., Doc. 70, Ex. G, 128:15-17).

However, the Court founds that items (2), (4), and (5) could constitute adverse
actions when considered together and across the entire period from November 2007 to
August 2008. Though Gentile acknowledges that she was never disciplined at work (e.g.,

reprimands, write-ups, suspensions, etc.), directions to an employee to finish a project quickly because her "job depends on it" could be adverse. Defendants' failure to intervene to prevent Bender's attorney from harassing her by calling her at work after Plaintiff complained about it could also be adverse. Obviously, terminations are adverse actions under Title VII.

Plaintiff argues both in her Charge and Complaint that the retaliatory acts were part of a continuing action against her. *See, e.g., Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997) (In Title VII retaliation claims, "a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period."). *Woodson* held that actions that by themselves would not constitute adverse action could be considered adverse action if considered as a whole (including termination). *Id.* at 921.

Plaintiff is not attempting to use temporal proximity to show causation, nor could she. Under several Third Circuit cases, the eight or nine months between Plaintiff's last protected activity in November 2007[9] and her discharge in July/August 2008[10] do not suggest a sufficient temporal proximity from which a court could infer a causal link. *LeBoon v. Lancaster Jewish Cmty. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (finding that "a gap of three months between the protected activity and the adverse action, without more, cannot create

---

[9] Excluding her application for unemployment compensation on July 1, 2008, request for maternity leave, and attempts to recoup unpaid wages.

[10] Defendants maintain an internally inconsistent position. They informed the Unemployment Compensation Board that Gentile had *quit.* (Doc. 70, Ex. Z; *see also* DW2 Dep., Doc. 70, Ex. B, 92:24-93:1). However, in their briefs, they agree with Gentile that at some point, Gentile was terminated.

an inference of causation and defeat summary judgment."); *Andreoli v. Gates*, 482 F.3d

641, 650 (3d Cir. 2007) (finding the same for a five-month gap).

Rather, Plaintiff is attempting to show a pattern of antagonism in the 8-9 month

interval between her last protected activity and resulting termination. In *Woodson*, the Third

Circuit found that there was sufficient evidence of a pattern of antagonism in the two-year

period between the plaintiff's filing of an EEOC charge and his subsequent discharge.

> The jury might reasonably have concluded that Scott engaged in a pattern of antagonistic behavior against Woodson after his complaints, setting him up to fail [by promoting him to lead] a poorly performing division, [refusing to provide him with necessary support], and then terminating him through a "sham" ranking procedure. Although none of the pieces of evidence that we have discussed, standing alone, would be sufficient to allow this inference (especially the "environment" evidence), the evidence as a whole can be so, particularly when we consider, as we must, that the verdict may have been based in part on the jurors' evaluation of each witness' credibility and demeanor.

*Id.* at 924. *See also Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)

(reversing district court grant of summary judgment in favor of defendant and finding

sufficient pattern of antagonism between the plaintiff's last complaint about gender

discrimination and discharge, a period of approximately six months. The defendant told the

plaintiff she was being taken off the "management track," advised her to look for another

job, and offered her position to a male while she was still employed with the defendant).

Because there is no unusually suggestive temporal proximity between Gentile's

protected activity and discharge, the Court must consider whether all of the adverse actions

taken together show a causal link between Gentile's protected activity and resulting

18

discharge. Plaintiff has sufficiently shown a pattern of antagonism over a nine-month period to establish a *prima facie* case of retaliation. With respect to this claim, Defendants spend the entirety of their brief arguing that Plaintiff has not established a *prima facie* case. Under the burden-shifting framework of *McDonnell Douglas*, they do not argue why Plaintiff was terminated for legitimate, non-retaliatory reasons. Therefore, the Court will deny Defendants' motion for summary judgment on this count.

### c. Tortious Interference

Plaintiff says she was terminated on June 28, and she filed for unemployment benefits on July 1, 2008. She began receiving them the second week of July, and her benefits ended around the beginning of August. (Gentile Dep., Doc. 62, Ex. E, 41:18-42:4).

On August 26, Steven stated in an oral interview with a Board representative that Plaintiff "just said she couldn't work anymore because she was pregnant. [S]he never gave us a dr's note or anything." (Doc. 70, Ex. Z). "She quit and we had to hire someone to replace her. There was no lack of work." (*Id.*). In a letter from DES dated August 29, 2008, Defendants reported to the Board, "Annmarie gave us notice ahead of time that she will be off for 2 or 3 weeks for maturity [*sic*] leave starting July 1st 2008. After 5 weeks we could no longer operate without another office worker, b[e]cause we had some temporary school help, and Annmarie told us she could not be back before Oct. 1st 2008 so we therefore hired another office employee." (Doc. 70, Ex. Y).

On August 30, Gentile filed her petition to appeal. (Doc. 62, Ex. M). At Gentile's appeal on October 1, Jeff Hanyon testified on DES's behalf, but Gentile failed to attend the referee's hearing.[11] (Doc. 62, Ex. N). The referee affirmed the denial of benefits on October 8, and Gentile filed her appeal on October 10. (Doc. 62, Ex. O, P). On November 18, the Board of Review affirmed the referee's judgment as modified and determined a $2,289 fault overpayment had been established. (Doc. 62, Ex. Q).

As an at-will employee, Plaintiff was not entitled to rely on whatever promises David may have made to her regarding hiring her back in October 2008 (see discussion of at-will employees, *infra*). Defendants were within their rights to contest her claim for unemployment compensation under the Unemployment Compensation Law. *See generally* 43 PA. CONS. STAT. § 821 *et seq*. Therefore, there could not have been tortious interference.

In light of the foregoing, Plaintiff's reliance on *Krashna v. Oliver Realty, Inc.*, 895 F.2d 111, 115 (3d Cir. 1990) is unavailing. First, *Krashna* dealt with the claim of tortious interference of the plaintiff's right to workmen's compensation, not unemployment benefits. Second, the court in *Krashna* ultimately determined that the Labor Management Relations Act did not completely preempt state law claims for interference with the right to worker's compensation benefits, and therefore, the district court lacked removal jurisdiction. To the court, the plaintiff's claim appeared more akin to a claim of tortious interference rather than

---

[11] Defendants claim that their communications to the Board were statements in a quasi-judicial action protected by absolute immunity. *See Milliner v. Enck*, 709 A.2d 417 (Pa. Super. Ct. 1998). This issue is now moot.

wrongful discharge, thereby exceeding the scope of the LMRA. In reaching its decision, the

Third Circuit stated that "We need not consider the viability of this state claim nor whether

ordinary preemption operates against it. These are matters for the state court." *Id.* at 115,

n.7. Therefore, while not explicitly recognizing a cause of action for tortious interference

with the right to receive worker's compensation benefits, the Third Circuit did not foreclose

the possibility that the cause of action existed.

Plaintiff has not been able to cite to any cases which recognize a cause of action for

tortious interference of the right to unemployment benefits. The Court will not fashion a new

state law cause of action where no authority exists to do so.[12] Thus, the Court will grant

Defendants summary judgment on this claim.

### d. Unpaid Wages

Plaintiff sues under Wage Payment Protection and Collection Law ("WPCL"), 43 PA.

CONS STAT. § 260.1 and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*,

for paid maternity leave, failure to provide two weeks' notice pay on termination, and failure

to pay for time worked and for overtime. Plaintiff's sole basis for her claim is that despite

the absence of a written policy, Costenbader was given two weeks' notice pay, but

Costenbader herself acknowledged that the Wengerds had not instituted any policy

regarding notice pay. (Costenbader Dep., Doc. 62, Ex. F, 211:16-21). *See Morosetti v.*

---

[12] By finding that Plaintiff does not have a cause of action in this case, the Court does not mean to imply that Plaintiff would not otherwise have a cause of action for the tort of wrongful discharge. *Phillips v. Babcock & Wilcox*, 503 A.2d 36 (Pa. Super. Ct. 1986) (holding that the tort of wrongful discharge was available only for at-will employees but not for employees who were protected by a collective bargaining agreement) (citing *Geary v. United States Steel Corp.*, 319 A.3d 174 (Pa. 1974).

*Louisiana Land and Exploration Co.*, 564 A.2d 151, 153 (Pa. 1989) ("A company may indeed have a policy upon which they intend to act, given certain circumstances or events, but unless they communicate that policy as part of a definite offer of employment they are free to change as events may require."). There is no evidence that DES required notice before an employee resigns; therefore there was no legally enforceable policy of DES entitling any employee to two weeks of notice pay under 43 PA. CON. STAT. § 291.

Plaintiff also claims that Steven is liable under the WPCL as an employer, whereas Defendants argue that Steven is not an employer as defined by case law. Under the WPCL, an employer "[i]ncludes every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." 43 PA. CONS. STAT. § 260.2a. Under the plain terms of the statute, at first blush, Steven would appear to be liable as the Vice-President of DES.

However, "[t]o hold an agent or officer personally liable for unpaid wages, evidence of an active role in decision making is required." *Hirsch v. EPL Techs., Inc.*, 910 A.2d 84, 88 (Pa. Super. Ct. 2006) (citing *Int'l Ass'n of Theatrical Stage Employees, Local Union No. 3 v. Mid–Atl. Promotions, Inc.*, 856 A.2d 102, 105 (Pa. Super. Ct. 2004) in which the court found the defendant was not an "employer" under the WPCL because though he was a production manager, he had no authority to make independent hiring decisions or to enter binding employment contracts)) (internal quotation marks omitted). Though a defendant's title as a

22

corporate officer may be relevant to the determination of whether he is an "employer" under the WPCL, it is not necessarily dispositive. Thus, a plaintiff must "show [the defendant] was actively involved in corporate policy-making, such as corporate decision-making or corporate advisement on matters of pay or compensation" (i.e. being the contracting party for the payment of wages). *Id.* at 91; *see also Walsh v. Alarm Sec. Group, Inc.*, 95 F. App'x. 399, 402 (3d Cir. 2004) (holding that the WPCL "imposes personal liability on high-ranking corporate officers for employees' unpaid wages.").

To illustrate when a corporate officer was or was not a policy-making officer, the *Hirsch* court cited several cases. For instance, though a defendant was authorized to sign checks on the corporate checking account, where there was no evidence that "he actively participated in decisions or gave advice regarding pay or compensation," but rather "that he merely carried out decisions made by others, . . . . there [was] no basis for appellee's liability, other than by virtue of holding office as corporate secretary." *Id.* at 91 (citing *Mohney v. McClure*, 568 A.2d 682, 685-66 (Pa. 1990) (granting summary judgment for the defendant (Hanak) because the plaintiff failed to produce evidence that Hanak was actively involved in corporate decision-making). In *Hirsch* itself, the Superior Court affirmed the trial court's ruling that the plaintiff, a company VP, was not an employ*er* (and was thus entitled to relief as an employ*ee* of the defendant-president under the WPCL) because even though he had the authority to sign binding documents as the corporation's assistant secretary, that authority was derived from the direction of the Board of Directors and his superiors. Hirsch

23

"had no independent authority to settle claims or write check to pay creditors. . . . While he dealt administratively with unemployment compensation claims filed by former employees, he had no independent authority to hire and fire employees, or to bind the corporation to agreements or obligations," absent the approval of his superiors. *Id.* at 90.

Here, the undisputed evidence shows that Steven is a minority shareholder of DES (S. Wengerd Dep., Doc. 62, Ex. B, 15:5-11) and the Vice-President. (*Id.* at 12:10-12). His duties include being responsible for accounting, employee payroll matters, and warehousing. (*Id.* at 12:21-24). The evidence also shows that he was the point of contact between DES and the Unemployment Compensation Board. (Doc. 70, Exs. Y, Z). However, no evidence has been presented that indicates whether Steven has independent authority to make policy or employment decisions or whether he can enter contracts binding DES. In fact, Steven testified that he acts under the authority of his father, David, and that he does not supervise the employees. (*Id.* at 23:19-24:4). Thus, Plaintiff has failed to meet her burden showing that Steven is actively involved in the corporate decision-making process. Like Hanak in *Mohney*, Steven is a "non-functioning corporate officer" who bears the title of Vice-President and performs some administrative work, but who lacks independent authority to do much else. *Mohney*, 568 A.2d at 683. Thus, the Court will grant summary judgment on this claim in favor of Steven.

Therefore, the Court will grant summary judgment to Defendants with respect to notice pay and will grant summary judgment to Steven Wengerd in the entirety of this count.

24

Defendants did not move for summary judgment on the issues of paid maternity leave or failure to pay for time worked/overtime under either the WPCL or FLSA, so those claims will stand for trial against the remaining defendants.

### e.  Wrongful Discharge

The parties disagree whether David can be held liable in his individual capacity on a wrongful discharge claim.  Defendants claim that common law wrongful discharge claims can be brought only against employers and cannot be brought against individuals under a supervisory theory of liability.  *Hrosik v. Latrobe Steel Co.*, No. 94-1361, 1995 WL 456212 (W.D. Pa. Apr. 25, 1995); *Leslie v. Philadelphia 1976 Bicentennial Corp.*, 332 F. Supp. 83, 93 (E.D. Pa. 1971) (saying it is "necessary that [the plaintiff] allege that [individual defendants] acted in their individual capacities, as opposed to corporate capacities.").  *See also Brennan v. Cephalon, Inc.*, No. 04-3241, 2005 WL 2807195 (D.N.J. Oct. 25, 2005).  Here, every fact alleged about David has been about him acting in his corporate capacity as owner of DES, so based on *Brennan, Hrosik,* and *Leslie,* the Court will dismiss him in his individual capacity.

In Pennsylvania, an employer may discharge an at-will employee for any reason whatsoever, subject to a few narrow exceptions.  An employee may bring a cause of action for a termination of that employment "only in the most limited circumstances, where the termination implicates a clear mandate of public policy." *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009).  Pennsylvania courts have recognized a public policy exception to the at-will

employee doctrine when an employee files an unemployment compensation claim.

*Weaver*, 975 A.2d at 564 (citing *Highhouse v. Avery Trans.*, 660 A.2d 1374, 1378 (Pa.

Super. Ct. 1995) ("if the . . . employer discharged [plaintiff] because he had made a claim for

unemployment compensation during a period when he was not working and earning

income, the discharge will constitute a violation of public policy and will support a tort claim

for wrongful discharge.").

Defendants attempt to distinguish *Highhouse* by saying that Plaintiff was terminated

before she filed her claim for unemployment benefits, because she allegedly quit or was

terminated on June 28, 2008, and she filed for unemployment benefits on July 1, 2008.

Thus, she could not have been terminated in retaliation for something that had not yet

occurred. However, there is conflicting evidence in the record as to when and whether

Plaintiff was terminated. Steven told the Unemployment Compensation Board that Plaintiff's

last day had been on June 28. (Employer Questionnaire, Doc. 70, Ex. Q). However, in a

letter to the Board, Steven said that she went on maternity leave on July 1, 2008 and

subsequently informed DES that she was not going to return to work. (Doc. 70, Ex. Y).

Meanwhile, Plaintiff's Petition for Appeal indicated that David terminated her by phone on

August 29. (Doc. 62, Ex. M, Petition for Appeal from Unemployment Compensation Board).

Because Plaintiff's actual termination date is a material fact that is in dispute, the

ruling in *Highhouse* does not justify an award of summary judgment for Defendants.

26

Therefore, the Court will dismiss David from this count but will deny Defendants' motion for summary judgment on it.

### f.   Fraud/tortious misrepresentation

Plaintiff claims David suggested she go on unemployment (Gentile Dep., Doc. 62, Ex. E, 89:2-90:7, 94:2-9), whereas David claims that Plaintiff offered to go on unemployment instead of taking maternity leave (DW2 Dep., Doc. 70, Ex. B, 70:10-20). Despite this dispute of facts, as a matter of law, Plaintiff does not have a cause of action.

Plaintiff was an at-will employee, and as such, has no cause of action for relying on David's promises that he would re-hire her on October 1, 2008. *See Paul v. Lankenau Hosp.*, 569 A.2d 346 (Pa. 1990); *see also Brethwaite v. Cincinnati Milacron Marketing Co.*, No. 94-3621, 1995 WL 232519 (E.D. Pa. Apr. 19, 1995) ("Since a claim of negligent misrepresentation requires that a plaintiff have justifiably relied on the alleged misrepresentation, and an employer's promise is not something which an employee can justifiably rely upon when the employment relationship is at will, this claim must fail.").

There are a few cases that support Plaintiff's position. *See, e.g., Mulgrew v. Sears Roebuck & Co.*, 868 F. Supp. 98, 104 (E.D. Pa. 1994) (allowing fraudulent misrepresentation claim to stand). However, *Brethwaite* distinguished *Mulgrew* because the court in *Mulgrew* did not discuss the at-will status of the plaintiff before determining that the plaintiff could move forward on the claim for fraud. The Court doubts that Pennsylvania

courts would recognize Plaintiff's fraud count as a valid claim based on her status as an at-will employee, so the Court will grant the motion for summary judgment on this count.

## V. Conclusion

For the above reasons, the Court will grant in part and deny in part Defendants' Motion to Strike and Motion for Summary Judgment.

As agreed to by the parties, the relevant portions of paragraphs 15, 21, 25, and 33 are stricken from Plaintiff's Answer to the Statement of Facts. (Doc. 74, Ex. B). To the extent that paragraphs 16, 19, 27, 29, 31, 32, 34, 37, 40, 44, 49, 50, 51, 52, 54, 55, 56, 60, 64, 66 and the remainder of paragraphs 15, 25, and 33 are inflammatory, irrelevant, or merely opinions or conclusions of law, the Court assigns no evidentiary value to them.

The Court also grants summary judgment in favor of Defendants on Count I (pregnancy discrimination), Count III (tortious interference against Defendants DES and David Wengerd), Count IV (notice pay and with respect to Steven Wengerd), Count V (with respect to David Wengerd from the wrongful discharge claim), and Count VI (fraud).

The claims remaining for trial are: Count I: sexual harassment based on gender and hostile work environment for failure to take prompt immediate action, Count II: retaliation for engaging in protected activity, Count IV: WPCL and FLSA claims for maternity leave, overtime, and time worked, and Count V: wrongful discharge under public policy. The remaining defendants are DES, CQH, and CDH on all counts, except for Count IV under which David also remains as a defendant. A separate Order follows.

28

Robert D. Mariani
United States District Judge